UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HUGO KAYO, | | |
| | Plaintiff, | 19 Civ. 365 (PAE) |
| -v- | | |
| PETER MERTZ, et al., | | OPINION & ORDER |
| | Defendants. | |

PAUL A. ENGELMAYER, District Judge:

Plaintiff Hugo Kayo ("Kayo") brings this action under 42 U.S.C. § 1983 against Bridge and Tunnel Officers Peter Mertz ("Mertz"), Kendra Corbin ("Corbin"), Charles Luce ("Luce"), Thomas Zapata ("Zapata"), and Sergeant Dennis Palazzola ("Sgt. Palazzola") (collectively, "defendants").  Kayo alleges that defendants violated his federal constitutional rights in connection with a 2016 incident at the Robert F. Kennedy toll plaza by falsely arresting him, using excessive force in effecting that arrest, and failing to intervene to stop the violation of his constitutional rights.  Kayo also brings § 1983 claims against Corbin and Mertz for infringing on his right to a fair trial by, allegedly, knowingly submitting false information to the Manhattan District Attorney.

Following discovery, defendants move for summary judgment on all claims, and Kayo moves for summary judgment on his fair trial claim.  For the reasons that follow, the Court grants in part and denies in part defendants' motion for summary judgment, and denies Kayo's partial motion for summary judgment.[1]

_____

[1] Kayo's Complaint also adverts, briefly, to possible claims under state laws tracking his federal claims.  *See, e.g.*, Dkt. 1 ("Compl.") ¶¶ 1, 34, 39.  It is not clear whether Kayo intended to bring,

I.      **Background**

     A.      **Factual Background**[2]

          1.      **The Parties**

     Kayo is a 53-year-old Latin-American male.  JSF ¶ 1.  Since 2006, he has been employed

by the Department of Homeland Security as a Behavioral Detention Officer and Immigration

Officer.  *Id.* ¶ 3.  Between 2001 and 2004, Kayo served as a New Jersey State Police Trooper, in

---

or that he has preserved, freestanding state-law claims.  Defendants' motion is directed solely to
the federal claims, and so the Court addresses these only.  In the event Kayo understands the case
to contain live, parallel state-law claims, he is to submit a letter, within three business days of
this decision, so stating and explaining, and addressing which of these survive in light of the
analysis of his federal claims in this decision.  Defendants' response, if any, is due within three
business days of Kayo's letter.

[2] This factual account draws from the parties' submissions on defendants' motion for summary
judgment and Kayo's partial motion for summary judgment, including the Joint Statement of
Undisputed facts, Dkt. 46 ("JSF"), defendants' Local Rule 56.1 statement, Dkt. 51 ("Def. 56.1"),
Kayo's Rule 56.1 counter statement, Dkt. 84 ("Pl. Counter 56.1"), Kayo's Rule 56.1 statement,
Dkt. 67 ("Pl. 56.1"), defendants' Rule 56.1 counter statement, Dkt. 77 ("Def. Counter 56.1"), and
the declarations (with accompanying exhibits) of N. Jeffrey Brown, Dkt. 48 ("Brown Decl."),
and David M. Hazan, Dkt. 83 ("Hazan Decl.").  The Court also relies on surveillance footage of
the events.  *See* JSF, Ex. E ("Surveillance Video").

Defendants make a number of factual allegations in the Brown Declaration that are not included
in their Rule 56.1 statement.  As a result, Kayo was not given an opportunity to cite counter-
evidence for these allegations.  Accordingly, unless otherwise undisputed or included in the JSF,
the Court treats these factual allegations as disputed.  Both sets of briefs also contain factual
allegations without citations to the record that are not included in the JSF or 56.1 statements.
The court likewise treats these facts as disputed.

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein.
Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary
evidence, and are denied by a conclusory statement by the other party without citation to
conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y.
Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the
statement required to be served by the moving party will be deemed to be admitted for purposes
of the motion unless specifically controverted by a correspondingly numbered paragraph in the
statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the
movant or opponent . . . controverting any statement of material fact[ ] must be followed by
citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

which post he was responsible for patrolling toll plazas that used EZ Pass. *Id.* ¶ 5. Between 1991 and 2001, he was also employed by the Federal Reserve Bank as a Law Enforcement Protection Officer with a sergeant rank. *Id.* ¶ 6. Between 1987 and 1991, Kayo served in the United States Marine Corps and was honorably discharged. *Id.* ¶ 7. Before the events at issue, Kayo was never the subject of any complaint or investigation into his conduct while employed as a law enforcement officer and was never disciplined. *Id.* ¶ 8.

On January 17, 2016, Mertz, Corbin, Luce, and Zapata were employed by the Triborough Bridge and Tunnel Authority ("TBTA") as Bridge and Tunnel Officers ("BTO"), also known as "peace officers." *Id.* ¶ 9. Sgt. Palazzola was employed by the TBTA as a Bridge and Tunnel Sergeant and was responsible for supervising the BTO officers and civilian personnel. *Id.* ¶ 10.

### 2. Events at the RFK Bridge Tunnel and Kayo's Arrest

On January 16, 2016, Kayo was living in New Jersey with his girlfriend, Maria Lock ("Lock"). *Id.* ¶ 14; Def. 56.1 ¶ 6. On the night of January 16, 2016, Kayo, Lock, and Lock's mother attended a birthday party for one of Lock's friends in Queens, New York. JSF ¶¶ 15–16. Kayo drove Lock, Lock's mother, and himself from New Jersey to the party in Queens in a 2015 Toyota Camry. *Id.* ¶¶ 16, 22. They arrived at the party at approximately 9 p.m. *Id.* ¶ 17. Kayo drank alcoholic beverages at the party. *See* Brown Decl., Ex. A ("Kayo Dep.")[3] at 14–15. At the party, Kayo and Lock met another party guest who also lived in New Jersey and who did not know how to get back to New Jersey from Queens. JSF ¶ 18. Kayo and Lock offered to let the guest follow them back to New Jersey. *Id.* ¶ 19. At approximately 2:30 a.m. on January 17,

---

[3] Certain pages from Kayo's and Mertz's depositions were omitted from the parties' initial submissions. The missing pages of Kayo's deposition are docketed at Dkts. 82-1 and 83-1. The missing pages of Mertz's deposition are docketed at Dkts. 82-2 and 88. For simplicity, the Court refers to all pages from Kayo's deposition as "Kayo Dep." and from Mertz's as "Mertz Dep."

2016, Kayo, Lock, and Lock's mother left the party and began to drive home.  *Id.* ¶ 20.  Lock

was driving; Kayo was in the front passenger seat.  *Id.* ¶¶ 21–22.  The guest and his wife, who

was driving, followed in their own car.  *Id.* ¶ 21; Kayo Dep. at 33.

As the two cars approached the Robert F. Kennedy Bridge ("RFK Bridge"), with Lock in

front and the guest following directly behind them, the guest called Lock and informed her that

he did not have an EZ Pass.  JSF ¶¶ 23–24.  Kayo offered to lend his EZ Pass to the guest so that

the guest could continue to follow their car back to New Jersey.  *Id.* ¶ 25.

Lock entered lane 14, an EZ pass lane, of the toll plaza.  *Id.* ¶ 29.  What happened next is

visually captured on surveillance video from the toll plaza.  The video shows the toll plaza from

four angles but has no audio.  The parties agree that the surveillance video accurately captures

portions of the incident from these angles.  *Id.* ¶ 28.  Three specifically capture lane 14; on the

video, these angles are labeled: "LN-14-Int," "LN-14-Ext," and "LN-14-Plate."  *See* Surveillance

Video.  The fourth, labeled "CA 5 LNS 12, 14, 16" shows a broader view of lanes 12, 14,

and 16.  *See id.*  The cameras face oncoming, northbound traffic.  *Id.*  On the toll plaza, there

were one or more signs that read "Stay in Vehicle.  Wait for Assistance."  *See* Def. 56.1 ¶ 3; Pl.

Counter 56.1 ¶ 3.  However, the parties dispute the exact position of the sign(s), whether a

second sign is visible on the video, and whether the sign(s) is a traffic control device.  *See* Def.

56.1 ¶ 3; Pl. Counter 56.1 ¶ 3.

Lock arrived at the lane 14 toll gate, paid the toll with Kayo's EZ Pass at 3:01:15 a.m.,

and proceeded through the gate.  JSF ¶¶ 26, 29.  Lock then traveled an unspecified distance from

the gate—it appears to be no more than 10–15 yards—and stopped the car in lane 14 at 3:01:23

a.m.  *Id.* ¶ 29.  The video shows the guest's car following directly behind Lock's into lane 14,

but, because the guest lacked an EZ Pass, the car was unable to pass through the gate, *id.* ¶¶ 27,

30, which at the time was guarded by a gate arm, *see* Surveillance Video.  The traffic traveling

through the toll plaza at this time was light.  JSF ¶ 32.  *See generally* Surveillance Video.  At

approximately 3:01:25 a.m., another car pulled into lane 14 behind the guest's car.  *See*

Surveillance Video at 3:01:25 a.m.  The guest's wife turned on her turn signal, but that car did

not immediately move.  *Id.* at 3:01:38 a.m.

Kayo, planning to give the guest his EZ Pass, got out of his car at approximately 3:02:01

a.m.  JSF ¶ 32.  Carrying his EZ Pass, he began walking toward the guest's car.  *Id.* ¶ 32.

Corbin, who was on duty monitoring traffic, observed Kayo leave his car and begin approaching

the toll gate.  *Id.* ¶¶ 11, 33.  As Kayo got out of his car and began to approach the gate, the car

that was stuck behind the guest's car reversed and pulled into a neighboring toll lane.  *See*

Surveillance Video at 3:02:00 a.m.–3:02:08 a.m.  Kayo told Corbin, from three to four feet away,

that the people in the car stuck at the gate in lane 14 were traveling with him and asked if Corbin

could give them his EZ pass.  JSF ¶ 33.  Corbin told Kayo she would not give the EZ Pass to the

driver in lane 14 and ordered Kayo to return to his car.  *Id.*

The parties dispute significant aspects of the events that followed.  On the surveillance

video, Kayo began to walk back toward his car after speaking with Corbin.  *See* Surveillance

Video at 3:02:20 a.m.  Kayo then stopped and turned back to look at the toll gate.  *Id.* at 3:02:26

a.m.  Kayo contends that he stopped and turned because another officer in the tollbooth, not

Corbin, was trying to speak to him or get his attention, but he could not hear what the other

officer was saying.  Kayo Dep. at 38–40.  Kayo testified he believed the officer might be offering

to hand the EZ Pass to the car in lane 14, and so began walking back toward the toll gate.  *See id.*

at 44; Surveillance Video at 3:02:42 a.m.  Corbin testified that when Kayo turned back and

began walking toward the toll gate, she believed he was not complying with her order because he

was intoxicated; she alleges that she could smell alcohol on his breath and noticed other signs of

intoxication: watery and bloodshot eyes, slurred speech, and unsteadiness on his feet. *See* Brown

Decl., Ex. B ("Corbin Dep.") at 169–70.  She further testified that she believed Kayo was putting

himself in danger by being on foot in the toll plaza. *Id.* at 175.

Kayo testified that when he went back to ask the other officer if he would hand the guest

his EZ Pass, the officer said something that Kayo could not hear.  Kayo Dep. at 44.  At this

point, Kayo testified, Corbin intervened. *See id.*  Corbin can be seen taking a few steps toward

Kayo. *See* Surveillance Video at 3:02:45 a.m.  She can then be seen raising and lowering her

arm toward Kayo several times. *Id.* at 3:02:47 a.m.  Kayo testified that he was unable to hear

what Corbin was saying but "figured [Corbin] wanted [him] back in the car." Kayo Dep. at 41.

However, he did not immediately walk back toward his car. *See* Surveillance Video at 3:02:48

a.m.  Kayo testified that Corbin screamed and cursed at him, but that at the same time, the other

officer was giving him instructions. *See* Kayo Dep. at 45.  He recalls that one of them told him

to return to his car but that he was confused by two people talking to him at once. *See id.* at 45–

47.

Mertz heard some of the interaction between Corbin and Kayo as he was leaving a nearby

building.  JSF ¶ 34.  Mertz had not seen Kayo exit the car. *Id.* ¶ 38.  At approximately 3:02:48

a.m., Mertz entered the frame of the fourth camera (CA 5 LNS 12, 14, 16) in the Surveillance

Video and began walking toward lane 14, where Corbin and Kayo were standing on either side

of the gate. *See id.* ¶ 34; Surveillance Video at 3:02:48 a.m.  As Mertz approached the toll gate,

Corbin took several steps toward Kayo. *See* Surveillance Video at 3:02:53 a.m.  Mertz continued

walking toward Kayo; Corbin appears to have spoken to Kayo. *See id.* at 3:02:56 a.m.

Defendants contend that when Mertz reached Kayo at approximately 3:02:59 a.m., *see id.*, Mertz

told Kayo multiple times to return to his car, but Kayo did not immediately do so, *see* Brown Decl., Ex. D ("Mertz Dep.") at 125–27.  Kayo disputes this.

Seconds after Mertz reached Kayo, he can be seen touching Kayo.  *Id.* at 3:03:02 a.m.  Mertz testified that he placed his hand on Kayo's back to escort Kayo back to his car and that he was justified in touching Kayo because Kayo had not heeded his instructions to return to the car.  *See* Mertz Dep. at 97, 125–27.  Kayo turned and began walking back toward his vehicle, JSF ¶ 35, and pushed Mertz's hand off his shoulder, *see* Surveillance Video at 3:03:04 a.m.–3:03:09 a.m.  The parties dispute the characterization of Kayo's action toward Mertz.  Mertz contends that he felt unsafe around Kayo because of Kayo's "aggressive[]" stance and because Kayo "put his hands on [Mertz]."  Mertz Dep. at 95–96.  Kayo contends that he did not expect to be touched and reacted instinctively.  *See* Dkt. 68 ("Pl. Opp'n").

Lock exited the driver seat of her car and walked quickly over to Kayo and the officers.  *See* Surveillance Video at 3:03:09 a.m.  As she approached, Kayo, who was facing her, either swung or gestured with his arm.  *See id.* at 3:03:14 a.m.  Lock then returned to her car as another officer began to approach Kayo and the officers.  *See* Surveillance Video at 3:03:25 a.m.  Kayo testified that he did not go back to his car at this point because the officers were talking to him.  Kayo Dep. at 87.

Defendants contend that at this point, Corbin informed Kayo that she was arresting him for disorderly conduct.  *See* Corbin Dep. at 204–05.  Defendants allege that as Corbin tried to put the handcuffs on Kayo, he twisted away and kept his arms in front of him so that she could not handcuff him.  *See id.* at 205; Mertz Dep. at 130.  Kayo disputes that he resisted arrest.  Between approximately 3:03:32 a.m. and 3:03:40 a.m., defendants arrested Kayo.  JSF ¶ 36.  Two other officers arrived on the scene as Kayo was being arrested.  *See* Surveillance Video at 3:03:26

a.m., 3:03:40 a.m.  Luce was working the 2 a.m.–12 p.m. shift that evening in the Special

Operations Division, and Zapata was working in the cash-collection booth in lane 12.  JSF

¶¶ 12–13.  Defendants claim that because Kayo was resisting, Zapata swept Kayo's legs out from

under him, and, as Kayo was brought to the ground, Corbin supported his upper back and

"cradled" him to the ground so that she could handcuff him.  *See* Corbin Dep. at 214, 218.[4]

Corbin then handcuffed Kayo after he was brought to the ground.  JSF ¶ 37.

Sgt. Palazzola arrived on the scene after Kayo was in handcuffs.  *Id.* ¶ 41.  Sgt. Palazzola

spoke with the other officers (Corbin, Mertz, Luce, and Zapata) about what had occurred before

Kayo was handcuffed.  *Id.* ¶ 42.  At no point did Kayo ask defendants for medical care.  *Id.* ¶ 40.

Kayo testified that he sustained scrapes on his knees and elbows, and experienced pain in his ribs

and neck.  *See* Kayo Dep. at 54–56.  He also alleged that he sustained psychological injuries and

that the arrest tarnished his otherwise good history as a law enforcement officer.  *See id.* at 56.

### 3.  Events Following Kayo's Arrest

Soon after Kayo's arrest that morning, Sgt. Palazzola completed the TBTA Arrest

Report.  *See* JSF ¶ 43; *id.*, Ex. F ("TBTA Arrest Report").  The other defendants provided

information to Sgt. Palazzola to enter into the TBTA Arrest Report.  JSF ¶ 44.  Mertz then faxed

the TBTA Arrest Report to the New York City District Attorney's Office.  *Id.* ¶ 45.  Sgt.

Palazzola listed Mertz as the arresting officer and Corbin as the assisting officer.  *Id.* ¶ 46; *see

also* TBTA Arrest Report.

At approximately 4:17 a.m. the same morning, Mertz and Corbin transported Kayo to the

25th precinct of the New York Police Department ("NYPD") where they processed his arrest.

JSF ¶ 47.  Mertz and Corbin prepared the NYPD Arrest Report, *id.*, Ex. G ("NYPD Arrest

---

[4] These disputed events are not addressed in either parties' Rule 56.1 statement.  The Court
includes them as context for the dispute whether officers used excessive force in arresting Kayo.

Report") and the NYPD Complaint Report, *id.*, Ex. H ("NYPD Compl. Report"); Mertz faxed

them to the New York County District Attorney's Office, *see* JSF ¶¶ 48–49.  Mertz and Corbin

finished processing Kayo's arrest at the 25th precinct at approximately 7:10 a.m. and then

transported him to Manhattan central booking.  *Id.* ¶ 50.  Kayo arrived at central booking at 7:33

a.m. and was held for "many" hours.  *Id.* ¶ 51.  At an unspecified time before Kayo's

arraignment later that evening, Corbin, Mertz, Luce, and Zapata gave Sgt. Palazzola information

regarding their use of force in the arrest, and Sgt. Palazzola prepared use-of-force reports for all

four officers.  *See id.* ¶¶ 52–53; *id.*, Exs. A–D (indicating force was used because Kayo was

resisting arresting and attempting to assault the officers).  Mertz faxed the use-of-force reports to

the Manhattan District Attorney's Office.  JSF ¶ 54.

### 4.    Kayo's Criminal Prosecution

On January 17, 2016 at approximately 2:48 p.m., Mertz signed the criminal court

complaint, *id.*, Ex. I ("Crim. Compl."), and returned it to the assistant district attorney.  JSF ¶ 55.

In it, Mertz alleged that he "observed [Kayo] exit his vehicle and run into the toll plaza."  Crim.

Compl.; *see also* JSF ¶ 56.  In fact, Mertz had not witnessed Kayo leave the car, and as is

apparent from the Surveillance Video, at no point did Kayo run toward the toll plaza.  *See* JSF

¶¶ 57–59.  *See generally* Surveillance Video.  Mertz further alleged that he "observed that cars

could not pass through the toll lane [Kayo's] vehicle was in because [Kayo] was on foot outside

of his car."  Crim. Compl.; JSF ¶ 60.

On the evening of January 17, 2016, Kayo was arraigned in New York County Criminal

Court and charged with disorderly conduct and resisting arrest, based on Mertz's representations

in the criminal complaint.  JSF ¶ 62.  Kayo was released on his own recognizance.  *Id.* ¶ 63.  He

was required to appear in New York County Criminal Court on three occasions to address the

charges brought against him.  *Id.* ¶ 64.  On November 18, 2016, all charges were dismissed when

Kayo accepted an adjournment in contemplation of dismissal ("ACD"), which was sealed by the court in its entirety. *Id.* ¶ 65; Brown Decl., Ex. I ("ACD").[5]

### B.    Procedural History

On January 14, 2019, Kayo filed the complaint. Dkt. 1 ("Complaint"). The case was assigned to Judge Torres. On February 19, 2019, defendants answered. Dkt. 21. On February 25, 2019, under Local Rule 83.10, the case was referred to the District's mediation program. On May 22, 2019 and June 19, 2019, unsuccessful mediation sessions were held. On September 9, 2019, Judge Torres held an initial conference and approved the parties' case management plan. Dkt. 28. On September 11, 2019, the case was reassigned to this Court.

On February 24, 2020, defendants submitted a letter stating that they intended to move for summary judgment. Dkt. 36. On March 6, 2020, Kayo submitted a letter indicating his intent to move for summary judgment on his fair trial claim. Dkt. 38. On May 4, 2020, the Court held a conference and set a schedule for the cross-motions. Dkt. 41.

On July 1, 2020, the parties filed their Joint Statement of Undisputed Facts and accompanying exhibits. JSF. On July 28, 2020, defendants filed their motion for summary judgment. Dkts. 49 ("Def. Mem."), 50 (motion). On October 10, 2020, Kayo filed his cross-motion on his fair trial claim, Dkts. 65 (motion), 66 ("Pl. Mem."), and his opposition to defendants' motion for summary judgment, Pl. Opp'n. On November 9, 2020, defendants filed their reply, Dkt. 75 ("Def. Reply"), and their opposition to Kayo's motion, Dkt. 76 ("Def.

---

[5] Kayo contests the materiality of this fact, but he does not dispute that he accepted an ACD. *See* Def. 56.1 ¶ 20; Pl. Counter 56.1 ¶ 20. Accordingly, the Court treats the fact that Kayo accepted an ACD as undisputed. *See* S.D.N.Y. Local Rule 56.1(c).

Opp'n"). On November 25, 2020, Kayo filed his reply[6] in support of his motion. Dkt. 78 ("Pl.

Reply").[7]

## II.    Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The movant bears the burden of demonstrating the absence of a question of material fact. In

making this determination, the Court must view all facts "in the light most favorable" to the non-

moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Rather, to survive a summary judgment motion, the opposing party must establish a genuine

issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A);

*see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

---

[6] Defendants have moved to strike Kayo's reply because it was filed two days late. *See* Dkt. 79.
Defendants have not identified prejudice from the late filing. The Court denies the motion.

[7] On March 4, 2021, the Court notified the parties that certain cited materials were missing from
the record. Dkt. 81. On March 5 and 8, 2021, respectively, defendants and Kayo submitted the
missing materials. Dkts. 82–85. On March 8, 2021, the Court invited a limited sur-reply from
defendants. Dkt. 86. On March 12, 2021, defendants submitted their sur-reply. Dkt. 87. On
March 12, 2021, defendants submitted an additional missing record page. Dkt. 88.

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.   Discussion

Kayo brings four claims under § 1983: for (1) false arrest; (2) excessive force; (3) failure to intervene; and (4) denial of right to a fair trial. Defendants move for summary judgment on all claims. Kayo moves for partial summary judgment on the fair trial claim only.

Section 1983 provides redress for the deprivation of federally protected rights by persons acting under color of state law. 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

### A.   False Arrest

Defendants move for summary judgment on Kayo's false arrest claim. They argue that they had probable cause to arrest Kayo for disorderly conduct, harassment, violating vehicle and traffic laws, and TBTA Rules and Regulations. *See* Def. Mem. at 4–12. They also argue that they had probable cause to arrest Kayo for resisting arrest. *See id.* at 15–16. In any event, defendants argue, they had arguable probable cause to arrest Kayo and therefore are entitled to qualified immunity. *See id.* at 12–14. Kayo argues that there are disputes of material fact that preclude summary judgment on either the merits of his false arrest claim or qualified immunity. *See* Pl. Opp'n at 3–17, 20–21. For the reasons that follow, the Court holds with Kayo.

12

1.      **Governing Law**

a.      *Probable Cause*

An arrest undertaken without a warrant "must be supported by probable cause or else it violates the Fourth Amendment." *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008). "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted); *accord Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). Under New York law, a plaintiff claiming false arrest must show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975)). For a defendant to be liable on such a claim, personal involvement is required. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006).

An officer is privileged—lawfully entitled—to make an arrest where probable cause exists. *See Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003); *Jenkins*, 478 F.3d at 84 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." (quotation marks and citation omitted)). Probable cause exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer*, 63 F.3d at 119 (quotation marks and citations omitted). "When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citation omitted); *accord*

*Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.").

"[P]robable cause does not require an awareness of a particular crime, but only that some crime may have been committed." *Ackerson v. City of White Plains*, 702 F.3d 15, 20 (2d Cir. 2012) (quotation marks and citation omitted); *see also Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) ("[A]n arrest is not unlawful so long as the officer ha[d] . . . probable cause to believe that the person arrested . . . committed any crime."). Provided there is probable cause, a person may be arrested for any offense committed in an officer's presence, no matter how minor, so long as that offense is a crime. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

"In a lawsuit claiming false arrest, the burden of establishing the absence of probable cause rests on the plaintiff." *Lin v. City of New York*, No. 14 Civ. 9994 (PAE), 2016 WL 7439362, at *7 (S.D.N.Y. Dec. 21, 2016) (cleaned up). On summary judgment, the existence of probable cause may be determined as a matter of law "if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852. But, where material facts on which such events and knowledge turn are disputed, summary judgment is not appropriate. *Id.*

b.    *Qualified Immunity*

An officer is entitled to qualified immunity if "arguable probable cause" existed—*i.e.*, if "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well

established law." *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (citation omitted). The doctrine of qualified immunity provides a complete defense where "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). Qualified immunity is intended to give "government officials breathing room to make reasonable but mistaken judgments" and to protect "all but the plainly incompetent or those who knowingly violate the law." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Because qualified immunity is an affirmative defense, defendants bear the burden of proving arguable probable cause. *See Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011).

### 2.   Discussion

Defendants claim to have had probable cause to arrest Kayo for (1) disorderly conduct; (2) harassment; (3) violating New York Vehicle and Traffic Laws Sections 1229-a and 1102; and (4) violating TBTA Rules and Regulations section 1023.3.

### a.   *Disorderly Conduct*

To prove disorderly conduct under N.Y. Pen. Law § 240.20 the prosecution must establish: "(i) the defendant's conduct must be 'public' in nature, (ii) it must be done with 'intent to cause public inconvenience, annoyance or alarm' or with recklessness as to 'a risk thereof,' and (iii) it must match at least one of the descriptions set forth in the statute." *Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001) (quoting N.Y. Pen. Law § 240.20). Defendants argue that, as to point (iii), "obstruct[ing] vehicular or pedestrian traffic," N.Y. Pen. Law § 240.20(5), is applicable to Kayo's conduct, *see* Def. Mem. at 6.

Kayo's actions in the toll plaza were undisputedly public.  The parties dispute, however, whether the evidence supplied probable cause that he acted with the requisite intent and whether he was "obstruct[ing] vehicular or pedestrian traffic."  N.Y. Pen. Law § 240.20(5).

As to intent, because determining intent is difficult in practice for an officer in the field, latitude is "accorded to officers considering the probable cause issue in the context of mens rea crimes." *Kass v. City of New York*, 864 F.3d 200, 210 (2d Cir. 2017) (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 393 (2d Cir. 2013)).  But, construing all reasonable inferences in favor of Kayo as the non-moving party, disputes of material fact preclude a finding that the officers had probable cause to conclude that Kayo had intentionally or reckless acted to cause public inconvenience, annoyance, or alarm.  Defendants argue that the officers could infer such intent because "Corbin and Mertz gave plaintiff multiple orders to get back in his vehicle," but, "despite multiple opportunities to comply, [Kayo] still refused to leave the highway and get back in his vehicle."  Def. Mem. at 7.  But that argument assumes facts in dispute.  Kayo admits that Corbin gave him an initial order, with which he began to comply, as the Surveillance Video reflects in showing Kayo initially turning and beginning to walk back to his car.  *See* Surveillance Video at 3:02:20 a.m.  However, Kayo testified that another officer, not Corbin, was trying to speak to him, but he could not hear what the officer was saying.  Kayo Dep. at 40.  He claims that he thought the officer might be offering to help him, and therefore began walking back toward the gate to speak with him.  *See id.* at 40, 44; Surveillance Video at 3:02:42 a.m.  Kayo further testified that although he saw Corbin raise and lower her arm and "figured [Corbin] wanted [him] back in the car," he was unable to hear was she was saying as she made this gesture.  Kayo Dep. at 41.  He further testified that Corbin then began yelling and cursing at him to go back to his car, but at this point the other officer was also giving him instructions, and he

was confused by the competing instructions. *See id.* at 45–47. Kayo's account is consistent with the neutral evidence (the videos). These leave the critical facts in dispute—the words stated to and heard by Kayo—unresolved. On Kayo's version of events, he was attempting in good faith to comply with the orders he was hearing, and such should have been apparent to an officer on the scene. A jury crediting this account of what was said and heard could justifiably find lacking probable cause that Kayo then intended to cause public inconvenience, annoyance, or alarm, as opposed to intended to navigate, in good faith, the confusing situation that had suddenly arisen.

It is similarly factually disputed whether Mertz, before touching Kayo and attempting to steer him back to the car, gave any command to Kayo. Mertz testified that he ordered Kayo to get back into his vehicle at least two or three times before touching him, *see* Mertz Dep. at 97, 125–26. But Kayo disputes that Mertz ever ordered him to return to his vehicle before grabbing him. *See* Surveillance Video at 3:03:02 a.m. Kayo claims that Mertz walked up to him and touched him without issuing any warning, and that he, Kayo, reacted instinctively because he did not expect to be touched. *See* Surveillance Video at 3:03:04 a.m.–3:03:09 a.m.; Pl. Counter 56.1 ¶ 15; Pl. Opp'n at 9. The silent, grainy video does not resolve this dispute. Kayo's version— that he was attempting to return to his car when Mertz grabbed him, and that this prevented him from returning to the car—is consistent with the video and could certainly be credited. *See* Surveillance Video at 3:03:04 a.m.–3:03:09 a.m. Indeed, in the JSF, the parties stipulated that Kayo "began walking back to his vehicle" at some unspecified point after Mertz approached him, but before Kayo was arrested. *See* JSF ¶ 35.

Defendants next argue that even if probable cause that Kayo acted intentionally to block traffic was lacking, there was probable cause that, with recklessness, he was creating a risk of causing a public disruption. *See Meyers v. City of New York*, 812 F. App'x 11, 15 (2d Cir. 2020)

(summary order).  This claim, too, founders on the standards applicable at summary judgment.

On Kayo's version of events, an officer would not have had good reason to infer a reckless state

of mind, but instead would have appreciated that he was attempting to hear and heed what the

officers were saying to him.

Defendants next argue that they had probable cause to arrest Kayo because he disobeyed

a lawful order to move.  *See Crenshaw v. City of Mount Vernon*, 372 F. App'x 202, 206

(2d Cir. 2010) (summary order).  But whether the officers gave such an order and in a manner

that Kayo could hear it is very much in dispute, as is whether Kayo was attempting to comply

with the order he heard.  A jury could certainly credit defendants' version of events, but a jury

could also credit Kayo that he was not given an order to move, and discredit an officer who

claimed to have perceived Kayo disobey such an order.

Apart from the dispute as to Kayo's state of mind during the few seconds at issue in the

toll plaza, the facts are also disputed as to whether Kayo was obstructing traffic, and on Kayo's

version of events, defendants would not have had probable cause to so perceive.  Defendants

argue that other cars were unable to use the toll lane, as evidenced by the car behind the guest's

car in lane 14, which, unable to move forward, eventually reversed direction to use another lane.

*See* Surveillance Video at 3:02:00 a.m.–3:02:08 a.m.  But at the time that car began to pull out of

the lane, Kayo had only begun to exit his car.  *Id.* at 3:01:58 a.m.  By the time Kayo approached

the toll gate, the other car was already in a neighboring lane.  *Id.* at 3:02:08 a.m.  Kayo can

reasonably argue that it was the fact that the car behind him lacked an EZ Pass, not his brief

sojourn from his car, that caused the guest's car briefly to be stuck in lane 14.  Whether any

drivers were obstructed by *Kayo's* actions is very much in dispute.  *See People v. Johnson*,

22 N.Y.3d 1162, 1164 (2014) (public harm element of disorderly conduct not satisfied where one

of defendants' companions was "partially blocking" a store entrance but where there was "no evidence that anyone trying to enter or leave the store was actually obstructed"). *People v. Tardif*, 66 N.Y.S.3d 761 (1st Dep't 2017), on which defendants rely, is easily distinguished. There, the defendant blocked a revolving door to a building, causing multiple people to have to exit the building through another door, and continued to do so despite orders to move. *See id.* at 762–63.  The undisputed facts do not, however, reveal that Kayo's sojourn from his car blocked any cars.  By Kayo's account, after he was prevented from sharing the EZ Pass with the car behind him, he was at all times trying to follow the orders he heard, and is not revealed by the video to have disrupted any car's movement through the plaza.

Defendants next argue that, by agreeing to lend his EZ Pass to the driver of the car behind him, Kayo caused the car behind him to stop and thus had already blocked traffic before he even left his car.  *See* Def. Opp'n at 8–10.  That argument does not follow.  Kayo's agreement to assist the trailing car did not cause that car to fail to clear the toll.  It was that car's lack of an EZ Pass, or money, that had that effect.  While Kayo's wisdom in exiting his car to share the EZ Pass can fairly be criticized, it was not the source of that car's stoppage.

In sum, material disputes of fact preclude a finding on summary judgment that the officers had probable cause to arrest Kayo for disorderly conduct.

### b.   *Harassment*

Defendants next argue that they had probable cause to arrest Kayo for harassment.  "A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person . . . [h]e or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same."  N.Y. Penal Law § 240.26(1).  As defendants note, "harassment is essentially similar to the offense of disorderly conduct since it

involves essentially the same conduct, but is directed toward an individual rather than toward the public in general." *People v. Todaro*, 26 N.Y.2d 325, 330 (1970).

Factual disputes preclude summary judgment as to this theory, too.  Defendants argue that, as to the first element of harassment, it is undisputed that Kayo subjected Mertz to physical contact or threatened to do so.  *See* Def. Mem. at 9.  They contend that in response to Mertz's attempt to "walk [Kayo] to his car" by "put[ting] one hand on his back and one hand on his arm," Kayo violently shrugged off Mertz's arm and turned to face Mertz.  Mertz Dep. at 101.  Kayo's version of events is different.  He attests that he was already turning back to walk toward his car when Mertz came up behind him and touched him without warning, and that—not violently—he instinctively shrugged Mertz's hand off his should and turned to face him.  *See* Surveillance Video at 3:03:04 a.m.–3:03:09 a.m.  The video does not conclusively resolve this dispute, but it is certainly consistent with Kayo's depiction of his shrug and turn as a non-violent non-event. Defendants alternatively argue that by turning to face Mertz after shrugging off Mertz's hand, Kayo threatened contact with Mertz, who perceived that Kayo wanted to fight.  *See* Def. Mem. at 9.  A jury may credit that version of events, but on summary judgment, viewing the evidence in the light most favorable to Kayo, a jury could find Kayo's account, in which Mertz touched him without warning and overreacted when Kayo turned and shrugged off his hand, the more credible.

Finally, as to the *actus reus* element, defendants argue that Kayo, by "flailing" his arm toward his girlfriend after she left his vehicle, subjected another person to physical contact or attempted to make such contact.  *See id.*  Defendants do not specify who Kayo was ostensibly threatening to make contact with via this gesture: Corbin, Mertz, or Lock.  The Surveillance Video is consistent with Kayo's simply gesturing toward his girlfriend and no more.  *See*

20

Surveillance Video at 3:03:14 a.m.  Defendants are at liberty to persuade a jury that they reasonably perceived this gesture as violent, but a jury could disbelieve them.  A jury could also disbelieve defendants' claim that Lock reached toward Kayo's shoulder and urged him to get back to the car, and that Kayo then "swung" his arm at her.  The video arguably does not show that sequence of events at all.  *See id.*

As to the intent element of harassment, defendants note that intent "may be implied by the act itself."  *People v. Strong*, 689 N.Y.S.2d 341, 345 (2d Dep't 1999); *see also People v. McGee*, 204 A.D.2d 353, 354 (2d Dep't 1994) ("The intent to commit a crime may be implied by the act itself, or it may be established by the defendant's conduct and the surrounding circumstances.").  But the acts at issue do not telegraph Kayo's intent with the clarity needed to warrant entry of summary judgment.  Defendants declare that Kayo's shrug was "in no way accidental," such that Kayo acted to harass, annoy, or alarm.  Def. Mem. at 9.  But on Kayo's version, which the video makes viable, the shrug betrayed no such intention, and on defendants' motion, it is Kayo's version which all reasonable inferences must be drawn to favor.  And the cases defendants paint as on-point are distinct, as in each, the arrested defendant instigated physical contact with the officer, from which an on-scene officer could infer intent to harass.  *See People v. Collins*, 178 A.D.2d 789, 789 (3d Dep't 1991) (defendant turned toward officer as he entered the house, "shoved him and attempted to close the door on him"); *People v. Hare*, 319 N.Y.S.2d 890, 891 (1st Dep't 1971) (defendant "plac[ed] his finger on the officer's chest and then reach[ed] for the police officer's pocket").  Here, in contrast, in Kayo's account, Mertz approached him from behind and grabbed his shoulder.

Accordingly, material disputes of fact preclude summary judgment, too, on the defense claim to have had probable cause to arrest Kayo for harassment.

###### c.   *Traffic Laws*

Defendants next argue that they had probable cause to arrest Kayo for violating New York traffic laws and TBTA Rules and Regulations.  Defendants rely on New York Vehicle and Traffic Law § 1229-a, which bans pedestrians from "occupy[ing] any space within the limits of a state expressway highway or state interstate route highway, including the entrances thereto and exits therefrom," and § 1102, which makes it a traffic offense to "fail or refuse to comply with the lawful order or direction of any police officer or flagperson or other person duly empowered to regulate traffic."

Section 1229-a, however, has an explicit exception for pedestrians seeking "to obtain assistance."  Here, not only does Kayo attest, but Corbin was undisputedly aware, that Kayo had left his car to try to hand his pass to the car behind him.  Defendants argue conclusorily that Kayo "was not entitled to seek assistance on behalf of another motorist," Def. Reply at 9, but they do not cite authority for that proposition.

As to Section 1102, defendants' claim of probable cause turns on which orders Kayo was found to have been given.  There is a ready factual basis for a jury, crediting defendants, to find that Kayo disobeyed, at least briefly, the directive to return to his car.  But, for the reasons set out above, a jury, crediting Kayo, could also find that Kayo abided by all orders conveyed to him, and that the officers overreacted in arresting Kayo and did not have a reasonable basis to believe that he had refused to comply with any order.[8]

---

[8] Kayo separately argues that these laws do not apply to the toll plaza, because it is outside their writ as an Interstate Route Connection under the TBTA's sole jurisdiction.  *Se* Pl. Opp'n at 10. The Court does not have occasion to resolve this issue, having found material disputes of fact to preclude finding, on summary judgment, probable cause to arrest under the traffic laws.  Should Kayo pursue this theory at trial, the Court will require a more coherent articulation of it.

As to TBTA Rules and Regulations § 1023.3,[9] defendants argue that they had probable cause to arrest for failing to comply with traffic control devices, because in this case, one or more signs read, "Stay in Vehicle.  Wait for Assistance."  One such sign is visible in the Surveillance Video.  *See* Surveillance Video at 3:00:00 a.m. (LN-14-Plate view).  The video, however, supplies the perspective of northbound traffic only.  The parties dispute whether Kayo could see this sign as a passenger as he passed through the toll or from his position in the plaza after he left his car.  *See* Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3.  Corbin and Mertz testified that there was a second sign on the passenger side of the toll gate.  *See* Corbin Dep. at 49; Mertz Dep. at 25.  But, because the second sign's existence and location is disputed, the Court cannot find on summary judgment that Kayo failed to heed such a sign, or that the officers necessarily had probable cause to arrest Kayo for violating section 1023.3.[10]

### d.    Resisting Arrest

Finally, defendants argue that they had probable cause to arrest Kayo for resisting arrest. *See* Def. Mem. at 15–16.  Under New York law, "[a] person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or peace officer from effecting an

---

[9] The Court assumes for purposes of this motion that the TBTA Rules and Regulations constitute traffic laws, such that a violation of these is a "traffic infraction."  *See United States v. McFadden*, 238 F.3d 198, 201–02 (2d Cir. 2001) ("Under New York law, the police may arrest someone without a warrant for a 'petty offense.' . . .  Petty offenses include traffic infractions." (quoting N.Y. Crim. Proc. Law § 140.10)).  The cases cited by defendants interpret New York Vehicle and Traffic Law provisions.  *See id.* at 201–02; *United States v. Dupree*, No. 16 Cr. 84 (ARR), 2016 WL 10703796, at *2 (E.D.N.Y. Aug. 29, 2016), *aff'd*, 767 F. App'x 181 (2d Cir. 2019) (summary order).  The Court has not been shown authority that a violation of the TBTA Rules and Regulations constitutes a "traffic violation" or a "petty offense" supporting arrest.

[10] Kayo also disputes whether the sign is a "traffic control device" and argues that defendants, in their preliminary disclosures, failed to give notice of his asserted failure to obey that sign.  The Court does not have occasion to address those questions here.  Kayo is free to make the latter argument in a motion *in limine*.

authorized arrest of himself or another person." N.Y. Penal Law § 205.30. "A key element of resisting arrest is the existence of an authorized arrest, including a finding that the arrest was premised on probable cause." *People v. Jensen*, 86 N.Y.2d 248, 253 (1995).

With the Court's having found that material disputes of fact preclude summary judgment as to whether there was probable cause to arrest, such disputes necessarily preclude finding probable cause for resisting arrest. In any event, even assuming a valid basis to arrest, there is a material factual dispute whether Kayo resisted arrest. Defendants argue that Kayo put his arms in front of him in an attempt to avoid being handcuffed, *see* Corbin Dep. at 204–05; Mertz Dep. at 130, but Kayo disputes that this was his intention or his gesture could be reasonably so read, Pl. Opp'n at 19–20, and a jury could find Kayo's claim more persuasive.

e.    *Qualified Immunity*

As the foregoing discussion reflects, an array of disputed factual issues preclude finding, on summary judgment, probable cause to arrest. These include disputes as to (1) which officers ordered Kayo to return to his car; (2) how many orders were given; (3) whether Kayo attempted to comply with those orders; and (4) whether the officers interfered with Kayo's attempts to comply. These same disputes make it premature to resolve defendants' motion for summary judgment on the false arrest claim on the basis of qualified immunity. Viewing the disputed facts in the light most favorable to non-movant Kayo, a jury could conclude that a reasonably competent officer would not have found probable cause to arrest for any of the above offenses, making Kayo's unjustified arrest a violation of a clearly established constitutional right. Because the "record plainly reveals the existence of genuine issues of material fact relating to the qualified immunity defense," the Court denies defendants' motion for summary judgment on this basis. *Hurlman v. Rice*, 927 F.2d 74, 82 (2d Cir. 1991); *see also Vitalone v. City of New York*, No. 15 Civ. 8525 (JGK), 2018 WL 1587591, at *6 (S.D.N.Y. Mar. 27, 2018) ("Because there are

issues of fact relating to the actions of the plaintiff and the officers at the time of the arrest, and these issues relate to the reasonableness of the officers' belief that there was probable cause to arrest, the motion for summary judgment on the basis of qualified immunity is also denied.").  At trial, defendants will be at liberty to ask the Court to direct the jury to make special findings as to the facts known to them at the time of arrest, so as to enable a clear determination as the whether these facts supplied arguable probable cause. *Warren v. Dwyer*, 906 F.2d 70, 75–76 (2d Cir. 1990) (where factual disputes preclude "early disposition of the [qualified immunity] defense, the jury should decide these issues on special interrogatories"); *see also Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003).

Defendants separately argue that Sgt. Palazzola is entitled to qualified immunity because he relied on information provided to him by other law enforcement officers. *See* Def. Mem. at 14.  Sgt. Palazzola undisputedly arrived on the scene after Kayo had been handcuffed, and spoke to each of the other officers on the scene (Corbin, Mertz, Luce, and Zapata) about the preceding events.  JSF ¶¶ 41–42.  That argument is correct.

"An officer who participates in the arrest is immune from suit in his or her individual capacity under the doctrine of qualified immunity if it was objectively reasonable for him to rely on a fellow officer's report indicating the existence of probable cause." *Lauderdale v. City of New York*, No. 15 Civ. 1486 (JGK), 2018 WL 1413066, at *5 (S.D.N.Y. Mar. 19, 2018) (cleaned up).  Thus, even where an officer is not "aware of all the underlying facts that provided probable cause or reasonable suspicion, [he] may nonetheless act reasonably in relying on information received by other law enforcement officials." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001).

Here, it was objectively reasonable for Sgt. Palazzola, who did not arrive until after Kayo had been handcuffed, to rely on the accounts of the four on-scene officers in processing Kayo's arrest, *i.e.*, completing the arrest and use-of-force reports. *See Lauderdale*, 2018 WL 1413066, at *5 (officer who arrived on scene after suspect was handcuffed entitled to qualified immunity because it was objectively reasonable for her to rely on the representation of officers on the scene); *see also Alicea v. City of New York*, No. 13 Civ. 7073 (JGK), 2016 WL 2343862, at *6 (S.D.N.Y. May 3, 2016) (officer entitled to qualified immunity where he relied on information provided by other officers who had identified suspect). Accordingly, Sgt. Palazzola is entitled to qualified immunity on the false arrest claim.

### B.      Excessive Force

Defendants move for summary judgment on Kayo's § 1983 excessive force claim against defendants Corbin, Mertz, Luce, and Zapata.[11] They argue that they used appropriate force and that Kayo sustained only minor injuries. Alternatively, defendants argue that they are entitled to qualified immunity on these claims.

#### 1.      Governing Law

##### a.      *Use of Force*

"The Fourth Amendment prohibits the use of excessive force in making an arrest." *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015). "[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of" a § 1983 excessive force claim and a state law assault and battery claim are "substantially identical." *Posr v. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991).

---

[11] Kayo agrees to drop his excessive force claim against Sgt. Palazzola. *See* Pl. Mem. at 2 n.1.

A police officer's use of force is excessive "if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'"  *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *see also Nimely v. City of New York*, 414 F.3d 381, 391 (2d Cir. 2005) (plaintiff alleging battery under New York state law must prove officer's conduct "was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties").  Factors relevant to this inquiry include:

> the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Figueroa v. Mazza*, 825 F.3d 89, 105 (2d Cir. 2016) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251–52 (2d Cir. 2001)).

"[W]hether the force used is excessive is to be analyzed under [the Fourth] Amendment's 'reasonableness' standard."  *Brown*, 798 F.3d at 100 (quoting *Graham*, 490 U.S. at 395).  The evaluation of a police officer's use of force must be made from the perspective of a reasonable police officer at the time of the incident, not based on hindsight.  *Graham*, 490 U.S. at 396.  Evaluating the reasonableness of an application of force requires a careful consideration of "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*

"Because the [§ 1983] excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa."  *Alicea*, 2016 WL 2343862, at *6 (quoting *Beier v. City of Lewiston*, 354

F.3d 1058, 1064 (9th Cir. 2004)); *see also County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 (2017) (federal law does not provide "that any Fourth Amendment violation that is connected to a reasonable use of force should create a valid excessive force claim"); *Jones v. Parmley*, 465 F.3d 46, 62 (2d Cir. 2006) (rejecting argument that "any force employed by a police officer would be unlawful so long as probable cause did not exist"); *Zellner*, 494 F.3d at 378 (same).[12] "Because the lawfulness of an arrest is irrelevant to an excessive force analysis, the plaintiff's excessive force claim must be analyzed separately from the false arrest claim." *Vitalone*, 2018 WL 1587591, at *6 (quotations and citations omitted).

"[I]t is . . . well established that not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a [plaintiff's] constitutional rights." *Mesa v. City of New York*, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *18 (S.D.N.Y. Jan. 3, 2013) (cleaned up). And "[t]he right to effectuate an arrest does include 'the right to use some degree of physical coercion.'" *Id.* (quoting *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005)).

>    b.    *Qualified Immunity*

"[E]ven if defendants' actions were unreasonable under current law, qualified immunity protects officers from the sometimes hazy border between excessive and acceptable force." *Kerman v. City of New York*, 261 F.3d 229, 239 (2d Cir. 2001) (cleaned up). "If the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity

---

[12] New York law is different on this point. Absent a warrant or probable cause, *any* use of force to effect an unlawful arrest can give rise to an excessive-force claim. *See, e.g.*, *Goonewardena v. Spinelli*, No. 15 Civ. 5239 (MKB) (ST), 2017 WL 4280549, at *11 (E.D.N.Y. Sept. 26, 2017) ("New York law holds that any force used during the course of an unlawful arrest gives rise to assault and battery claims against the arresting officers."); *Loftin v. City of New York*, No. 15 Civ. 5656 (MKB), 2017 WL 3614437, at *7 (E.D.N.Y. Aug. 21, 2017) (same) (collecting cases); *see also Ivery v. Baldauf*, 284 F. Supp. 3d 426, 437 (W.D.N.Y. 2018) (same).

defense." *Id.* (citation omitted). But "[g]iven the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004); *see also McKenzie v. City of New York*, No. 17 Civ. 4899 (PAE), 2019 WL 3288267, at *10 (S.D.N.Y. July 22, 2019).

### 2.    Discussion

Kayo testified that as a result of the arrest, he sustained scrapes on his knees and elbows, experienced pain in his ribs and neck, and sustained unspecified psychological injuries. Kayo Dep. at 54–56. Defendants contend that Kayo's injuries are *de minimis* and do not rise to the level required for a federal excessive force claim.

A plaintiff need not have sought medical attention to support an excessive force claim. *See Hodge v. Village of Southampton*, 838 F. Supp. 2d 67, 77 (E.D.N.Y. 2012) ("The fact that plaintiff did not require substantial medical treatment at the hospital following the incident does not necessarily mean that [defendant] is entitled to summary judgment."). "If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987). However, "neither *Maxwell* nor *Robison* stand for the proposition that complaints of pain, bruising, and swelling are alone sufficient to preclude summary judgment." *Richardson v. N.Y.C. Health & Hosps. Corp.*, No. 05 Civ. 6278 (RJS), 2009 WL 804096, at *11 (S.D.N.Y. Mar. 25, 2009). Instead, "courts must look to the totality of the circumstances relating to the conduct of law enforcement officers," including the "manner in which the plaintiff's alleged injuries were inflicted during the arrest." *Id.*

Even evaluating the force used in the light most favorable to Kayo, defendants are entitled to summary judgment on Kayo's excessive force claims. It is undisputed that defendants

used some amount of force in arresting Kayo. *See* JSF, Exs. A–D (use-of-force reports). Critically, Kayo does not dispute the officers' account of how *much* force was used. His argument instead is that because he was not resisting arrest, any use of force was unreasonable. *See* Pl. Opp'n at 18. Under federal law, that is wrong. Officers are entitled to use some amount of force in effecting an arrest. *See Mesa*, 2013 WL 31002, at *18.

Kayo next points to the injuries he sustained as a result of the arrest as evidence that the force used was excessive. Kayo testified that he suffered scrapes on his knees and elbows and experienced pain in his ribs and neck. Kayo Dep. at 54–56. But he also testified that he not only did not seek medical treatment—he did not even treat his injuries himself. *See id.* at 55–56. He did not testify that any scrape or pain lasted for any period following his arrest. *De minimis* injuries can serve as evidence that *de minimis* force was used. *See Washpon v. Parr*, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008). And in these circumstances, Kayo's injuries, on their own, are simply too *de minimis* to give rise to a dispute of fact—to raise an inference that an unconstitutional amount of force was used in effecting his arrest. *See, e.g.*, *Richardson*, 2009 WL 804096, at *13 (pain in shoulder, neck, and back and bruising, swelling, and red-marked wrists that lasted a "couple of days" and were treated with over-the-counter pain reliever did not suggest unconstitutional force was used); *Rincon v. City of New York*, No. 03 Civ. 8276 (LAP), 2005 WL 646080, at *5 (S.D.N.Y. Mar. 21, 2005) (stitches that reopened when officers threw plaintiff to the ground, causing bleeding, and swelling that lasted several days not indicative of unconstitutional force); *Cunningham v. Rodriguez*, No. 01 Civ. 1123 (DC), 2002 WL 31654960, at *5 (S.D.N.Y. Nov. 22, 2002) ("neck, shoulder, lower back, and hip pain" from hits to the back and face lasting one week showed that only *de minimis* force was used); *cf. Hudson v. McMillian*, 503 U.S. 1, 4 (1992) ("minor bruises and swelling of his face, mouth, and lip," and

"loosened . . . teeth and cracked . . . partial dental plate" not *de minimis*); *Maxwell*, 380 F.3d at 108–10 (denying summary judgment where officer shoved plaintiff, causing her head to strike the police car and resulting in bruising and post-concussive syndrome); *Robison*, 821 F.2d at 924 (denying summary judgment where officer caused bruises that lasted several weeks when he twisted plaintiff's arm, "yanked" her out of the car, and threw her up against the fender).

Kayo next argues that he chose not to put all facts regarding whether he was resisting arrest or the extent of his injuries in his 56.1 statement because they are disputed facts. *See* Pl. Opp'n at 18. That was his choice. Opposing a motion for summary judgment, however, Kayo had every reason to put forward his version of disputed facts bearing on this claim, much as he did with the false arrest claims, in the event that his version, if credited, would make out a viable claim. The Court is limited to ruling based on the record presented by the parties on the motions for summary judgment. Even drawing all reasonable inferences in favor of Kayo, *i.e.*, that he was not resisting and that his injuries are as described at his deposition, and resolving all factual disputes presented to the Court in his favor, no reasonable juror could conclude that the amount of force used in effecting his arrest bespoke a Fourth Amendment violation.

Because the Court has found that the use of force was too *de minimis* to support a federal claim of excessive force, the Court does not have occasion to decide whether defendants are entitled to qualified immunity.

### C. Failure to Intervene

An officer can be held liable under § 1983 for "the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that: (1) excessive force is being used, (2) a citizen has been unjustifiably arrested, or (3) any constitutional violation has been committed by a law enforcement official." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted). A plaintiff cannot succeed on a claim for failure to

intervene under § 1983 when there is no underlying constitutional violation.  *Wieder v. City of New York*, 569 Fed. App'x 28, 30 (2d Cir. 2014) (summary order) ("Because the underlying constitutional claims were properly dismissed, we also affirm the district court's dismissal of plaintiff's failure to intervene claim.").  "[F]or liability to attach" for failure to intervene, "there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557.

Defendants' only argument on this motion as to the failure to intervene claims is that because they are ostensibly entitled to summary judgment on all of Kayo's underlying § 1983 claims, they necessarily prevail on the failure to intervene claim.  *See* Def. Mem. at 20–21.  Kayo agrees that if his underlying claims fail, the failure to intervene claims are unsustainable.  *See* Pl. Opp'n at 22–23.

The Court, however, has left Kayo's false arrest claims against Corbin, Mertz, Luce, and Zapata standing.  It thus denies defendants' motion for summary judgment on the claims that these officers failed to intervene to prevent a false arrest.  At the close of evidence at trial, the Court will determine, on a defendant-specific basis, whether there is sufficient evidence to support a plaintiff's verdict on the failure to intervene claims, an issue that defendants have not raised on summary judgment.  However, for the same reasons that Sgt. Palazzola is entitled to qualified immunity on the false arrest claim, he is entitled to qualified immunity on the failure to intervene claim relating to the false arrest.  Because he arrived on the scene after Kayo had been arrested, it was objectively reasonable for him to rely on the representations of the four officers who were present on the scene in continuing to process Kayo's arrest.  *See Colon*, 250 F.3d at 135; *Lauderdale*, 2018 WL 1413066, at *5.

The Court grants defendants' motion for summary judgment as to the claims of failure to intervene in the use of excessive force against Corbin, Mertz, Luce, and Zapata. That is because the Court has granted defendants' motion for summary judgment as to the excessive force claims and so there is no underlying constitutional violation of this nature.

### D.      Federal Denial of Right to a Fair Trial[13]

The parties bring cross-motions for summary judgment on Kayo's § 1983 fair trial claim. This claim centers on two undisputedly false statements made by Mertz in the criminal complaint, which he faxed to the Manhattan District Attorney's Office: (1) that Mertz saw Kayo leave his car, and (2) that Kayo "ran" toward the tollgate. *See* JSF ¶¶ 57–59. Kayo argues that these statements were central to his being charged with disorderly conduct, and that, as a result, he was deprived of liberty, insofar as he was thereafter required to appear in state criminal court on three occasions to address the charges brought against him. *Id.* ¶ 64. Defendants dispute that these statements were actionable as they were not capable of influencing a jury and that Mertz made his false statements intentionally. They also argue that Kayo's acceptance of the ACD bars his fair trial claim.

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). Because the right to be free from such misconduct is clearly established, and because "no

---

[13] Kayo has agreed to withdraw his fair-trial claim against Luce, Zapata, and Sgt. Palazzola. *See* Pl. Mem. at 2 n.1. The Court also dismisses this claim as against Corbin because Kayo neither addressed nor mustered any evidence about Corbin in his submissions on this claim.

reasonably competent police officer could believe otherwise," qualified immunity is unavailable on such a claim. *Id.*

The elements of a § 1983 fair trial claim are: "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016). Until recently, whether the criminal proceedings terminated in the plaintiff's favor, although an element of a common law malicious prosecution claim, was not an element of a § 1983 fair trial claim. *See Ricciuti*, 124 F.3d at 129. Accordingly, a "trial [was] not a prerequisite to a [fair trial] claim," *Collins v. City of New York*, 295 F. Supp. 3d 350, 371 (S.D.N.Y. 2018), and fair trial claims were sustained even where charges had been dismissed before trial, *Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 415 (S.D.N.Y. 2018); *see also Ricciuti*, 124 F.3d at 130 (reversing summary judgment and reinstating fair trial claim where charges had been dismissed before trial). Given this standard, a plaintiff's acceptance of an ACD was not fatal to an otherwise viable fair trial claim. *See, e.g.*, *Collins*, 295 F. Supp. 3d at 371 (denying defense motion for summary judgment on fair trial claims where plaintiffs accepted ACDs); *see also Dowling v. City of New York*, No. 11 Civ. 4954 (NGG), 2013 WL 5502867, at *6 (E.D.N.Y. Sept. 30, 2013) ("A prosecution may be required for a claim of malicious prosecution, but [n]o precedent exists, in this circuit or otherwise, for dismissing a § 1983 claim for deprivation of the right to a fair trial in light of a plaintiff's acceptance of an ACD." (quotation and citation omitted)).

The Supreme Court's recent decision in *McDonough v. Smith*, 139 S. Ct. 2149 (2019), however, has caused a reassessment of that proposition. There, the Court reversed the Second Circuit's holding that, for statute-of-limitations purposes, a fair trial claim accrues "(1) when a

plaintiff learns of the fabrication and it is used against him, and (2) his liberty has been deprived in some way." *McDonough v. Smith*, 898 F.3d 259, 266 (2d Cir. 2018) (citation omitted). Analogizing to common law malicious prosecution, the Supreme Court held that a fair trial claim "accrues only once the underlying criminal proceedings have resolved *in the plaintiff's favor*." *McDonough*, 139 S. Ct. at 2156 (emphasis added).

The Second Circuit has not yet addressed whether, as this excerpt suggests, *McDonough* makes favorable termination an element of all § 1983 fair trial claims. But most "courts in this Circuit read *McDonough* to require favorable termination in fair trial claims that allege a deprivation of liberty resulting from the use of fabricated evidence in a criminal proceeding." *Corso v. Calle-Palomeque*, No. 17 Civ. 6096 (NRB), 2020 WL 2731969, at *7 (S.D.N.Y. May 26, 2020) (quotations and citation omitted) (collecting cases); *see also Gondola v. City of New York*, No. 16 Civ. 369 (AMD) (SJB), 2020 WL 1433874, at *4 (E.D.N.Y. Mar. 24, 2020); *Smalls v. Collins*, No. 14 Civ. 02326 (CBA) (RML), 2020 WL 2563393, at *3 (E.D.N.Y. Mar. 16, 2020); *Daniels v. Taylor*, 443 F. Supp. 3d 471, 478 (S.D.N.Y. 2020); *Goldring v. Donawa*, No. 16 Civ. 5651, 2019 WL 4535507, at *4 (E.D.N.Y. Sept. 19, 2019); *Rosario v. City of New York*, No. 18 Civ. 4023, 2019 WL 4450685, at *6 (S.D.N.Y. Sept. 16, 2019). *But see Miller v. Terrillion*, 436 F. Supp. 3d 598, 603 (E.D.N.Y. 2020) ("[T]he [*McDonough*] majority did not go as far as to impose wholesale a favorable termination requirement on all fair trial claims."). Although recognizing that *McDonough* is not conclusive on this point—directed as it was to a different, statute-of-limitations, issue—this Court joins this majority and reads *McDonough* to make favorable termination an element of fair trial claims.

The favorable-termination requirement presents an obstacle for a plaintiff who accepted an ACD. The Second Circuit has not examined *McDonough* or, assuming that decision is read as

most have read it, its application to fair trial claims where the plaintiff accepted an ACD.[14]

Accordingly, the law in this Circuit "remains unsettled as to whether an ACD constitutes a

favorable termination in the context of a fair trial claim based on fabrication of the evidence."

*Daniels*, 443 F. Supp. 3d at 478.  But in the context of malicious prosecution claims, it is well-

established that acceptance of an ACD extinguishes the claim "because it is a bargained-for

dismissal of the criminal case."  *Rothstein v. Carriere*, 373 F.3d 275, 287 (2d Cir. 2004); *see also*

*Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002) (ACD held "not a favorable termination

because it leaves open the question of the accused's guilt").  Among the district courts in this

Circuit to address this question post-*McDonough*, most have found that a § 1983 plaintiff's

acceptance of an ACD bars a fair trial claim based on fabricated evidence.  *See, e.g.*, *Maradiaga*

*v. City of New York*, No. 16 Civ. 8325 (GBD), 2020 WL 5849465, at *6 (S.D.N.Y. Oct. 1, 2020);

*Daniels*, 443 F. Supp. 3d at 479–80; *Corso*, 2020 WL 2731969, at *7; *Miller*, 436 F. Supp. 3d

at 604 (viewing fair trial and malicious prosecution claims "through the lens of *McDonough*

leads to the inevitable conclusion that [a plaintiff's] fair trial claim is barred by his acceptance of

an ACD").  *But see Ross v. City of New York*, No. 17 Civ. 3505 (PKC) (SMG), 2019 WL

4805147, at *7–8 (E.D.N.Y. Sept. 30, 2019) ("[B]ecause fair trial jurisprudence . . . is primarily

concerned with the potential for invalidating criminal convictions, the favorable termination

requirement for fair trial claims (assuming there is one) is necessarily different and more

expansive than the one for malicious prosecution claims.").  This Court joins the majority of

district courts in this Circuit in finding that, insofar as malicious prosecution and fair trial claims

are similarly addressed to prosecutions corrupted by the official fabrication of incriminating

---

[14] The issue is the subject of a pending appeal.  *See Daniels v. City of New York*, No. 20-1331
(2d Cir.).

evidence, the characterization of an ACD logically should be the same for both types of claims. *See Daniels*, 443 F. Supp. 3d at 479.

Accordingly, because the Court finds as a matter of law that acceptance of an ACD does not constitute a favorable termination for purposes of a § 1983 fair trial claim, Kayo's fair trial claim must be dismissed.  Defendants' motion for summary judgment as to the fair trial claim is granted, and plaintiff's motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment, and denies Kayo's partial such motion.  Specifically, the Court grants defendants' motion for summary judgment as to Kayo's fair trial claim, excessive force claims, and failure to intervene claims to the extent these relate to the alleged use of excessive force. The Court also grants defendants summary judgment on all remaining claims against Sgt. Palazzola.  The Court denies defendants' motion for summary judgment as to all other claims.

As reflected herein, the parties are to submit letter briefs forthwith as to whether Kayo has brought and preserved claims based on New York state law and if so, the extent to which these survive this decision.  *See supra* p. 1 n.1.  The Court will resolve any questions presented by these letters and promptly thereafter set a date for the final pretrial conference and submission of the Joint Pretrial Order and other pretrial filings, as set forth in the Court's Individual Rules.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 50, 65, and 79 and to terminate Sgt. Palazzola as a defendant.

SO ORDERED.

_Paul A. Engelmayer_

Paul A. Engelmayer
United States District Judge

Dated: March 31, 2021
      New York, New York